CITY OF ALMA *v.* PURCELL.

1. MUNICIPAL CORPORATIONS—CONTRACTS—BREACH OF CONTRACT— REPLEVIN—EVIDENCE—DIRECTED VERDICT.

   In replevin proceedings by a city to recover the possession of certain well drilling machinery which defendant, in a written contract, agreed should remain in the possession of the city until he had fulfilled his contract with it of putting down a sufficient number of wells capable of producing a guaranteed flow of water on a combined

---

On the question of construction of contract to dig a well as to the quantity or quality of water furnished thereby, necessity of test, etc., see note in L. R. A. 1918A, 1085.

test of all the wells, but which he had removed without the city's consent before making said test, evidence that a test by the city demonstrated that the wells were incapable of producing the guaranteed quantity, and that defendant refused to co-operate with the city in making said test, *held*, to justify a directed verdict in favor of the city.

2. SAME—POSSESSION OF MACHINERY AS SUBSTITUTE FOR BOND VALID—CONTRACTS—BREACH OF CONTRACT—REPLEVIN.

Where no bond was required by the city, as is usual in contracts with municipalities, as a *quasi* substitute therefor it was not illegal to stipulate that possession of said well machinery should remain in the city as security for the faithful performance of the contract, and the same is valid and enforceable in a possessory action where nonperformance is shown.

Error to Gratiot; Moinet (Edward J.), J. Submitted February 2, 1921. (Docket No. 127.) Decided May 5, 1921.

Replevin by the city of Alma against A. R. Purcell for the possession of certain well drilling machinery. Judgment for plaintiff on a directed verdict. Defendant brings error. Affirmed.

*James J. Noon* and *Albert O. Reece,* for appellant.

*James G. Kress* and *Searl & Searl,* for appellee.

STEERE, C. J. On April 30, 1918, defendant entered into a contract with the city of Alma to drill for it a sufficient number of wells to supply the city with a stated quantity of water, the drilling to be done upon a described block of land belonging to the city. The essential provisions of said contract are as follows: (Paragraphs numbered for reference.)

(1)—"the said contractor for and in consideration of the price named herein, to be paid by the city and under the penalty expressed therein, agrees and binds

himself to furnish all the machinery, tools, labor, material, equipment, fuel, electric current, water, service piping, weir measuring box and all special connections for temporary use in determining capacity of each well drilled and everything necessary in the premises, which may be required for drilling, casing and testing a sufficient number of wells to furnish the city with safe drinking water, said wells to produce at least two thousand (2,000) gallons of water per minute at not to exceed fifteen (15) inches vacuum at elevation eighty-eight (88) city datum, and said contractor guarantees to produce the same for the sum of forty thousand ($40,000) dollars.

(2) "When individual wells are drilled, the contractor shall put the same through a standard weir. The flow of water shall be measured by a standard weir. When the individual wells,. as measured individually, produce at least two thousand (2,000) gallons of water per minute for all of them, they shall be combined and measured in one volume so there shall be at least two thousand (2,000) gallons of water per minute from all of them combined.

(3) "The wells are to be eight (8) inches to ten (10) inches in diameter and shall be cased with a standard black drive pipe and the screens to be used shall be manufactured by the Johnson Screen Company of St. Paul, Minn.

(4) "The laws of the State and the ordinances of the city must be observed by the contractor; good order must prevail; the engineer for the city is authorized to reject defective materials or workmanship; contractor will assume all responsibility for accidents and casualties and hold the city harmless and insure all men employed under this contract against injury.

(5) "The payments to be made by the city as follows: When each well is completed and the flow thereof is measured, the contractor shall be entitled to a payment of seventy-five (75) per cent. of the *pro rata* on the total amount coming to him under the entire contract of not less than two thousand (2,000) gallons per minute. The two thousand (2,000) gallons being used as a basis of computing the amount due him in each instance.

(6) "Upon the completion of said wells and the

contractor has demonstrated to the common council and their engineer that he has produced the amount of water required under this contract and that he has paid all claims for material, labor, accidents and damage and fulfilled all the covenants of this contract, he shall be entitled to fifteen per cent. (15%) of the contract price; but this shall not be paid until the final test of all wells combined which is to be deferred as to this payment until the city has installed its pumping machinery and the necessary suction pipes leading to the well.

(7) "The remaining ten (10) per cent. of the contract price shall be paid one year from the date of the final testing of the wells providing that the wells are producing the above amount of water under the above conditions which test shall be satisfactory to the common council of said city all as heretofore set forth in this contract. Otherwise said amount shall not be paid until the contractor shall demonstrate to the common council of said city and its engineer, that the wells are furnishing the amount heretofore specified as required under the conditions set forth in this contract.

(8) "All of the wells put in under this contract shall be upon block No. 17 of the original plat of the village, now city of Alma, Michigan, according to the recorded plat thereof and adjoining property thereto now owned by the city. The exact place where each well shall be put down shall be determined by the contractor.

(9) "Said contractor shall complete and finish everything to be done under this contract on or before December first, A. D. 1918.

(10) "During the time that the contractor is performing under and completing this contract, the title and possession of two well drilling machines and his entire equipment used in said work which shall belong to him and be free from encumbrance and not be encumbered by him, shall remain in the possession of said city and in case of the nonfulfilment of said contract, the right, title and interest of all of said specified property as a penalty for the nonperformance of the guaranty under this contract and the loss the city has sustained in the premises, becomes the property

of said city, the same as if sold to said city by bargain and sale with full consideration paid and said city may dispose of said property and give a good and clear title to same as it shall see fit.

(11) "In case the contractor shall not fulfill said contract by producing the amount of water required or otherwise, the city shall have the benefit of what he has done and he shall have no right, title or interest in the wells drilled and the seventy-five (75) per cent. of the contract price which he has received for the wells he has drilled shall be in full payment for all that he has done and everything he has furnished in the premises and he shall lose all the machinery and equipment as heretofore set forth.

(12) "Both parties hereto agree to complete their several parts of this contract by December first, 1918, as hereto stated, excepting in case of inability to get delivery on certain materials by causes beyond their control, but either party must use their best efforts to obtain the materials as quickly thereafter as possible."

Soon after entering into the contract defendant commenced drilling at such spots on the designated property as he selected, and drilled 14 wells by December 1, 1918, which by separate tests made as each well was claimed completed produced in the aggregate the flow of water specified in the contract. The individual test of each well was made by measuring the flow put through a standard weir by defendant, the then city engineer measuring and taking data of its flowage, which was preserved by the city. These records of the wells separately tested as claimed completed by defendant showed when compiled an aggregate flow of 2,038 gallons per minute. No tests were made in the meantime to determine whether one well took water from another, as was shown to sometimes be the case, defendant claiming he could tell by observation as the individual tests were made whether any well "decreased this so-called flowage," and that it did not. He never measured nor combined for measurement the flow of the 14 wells in one volume, nor demon-

strated a flow of at least 2,000 gallons of water per minute from all of them combined. Neither did he ever offer to co-operate with or aid the city in doing so. Claiming his duties were ended when the total flow by separate tests of individual wells showed in the aggregate a flow of not less than 2,000 gallons per minute, he quit, on December 2, 1918, leaving the wells uncapped and uncared for, never, as he admitted, requested of the city council a combined test or sent them any written communication on the subject, and "never went back and did anything about having a combined test."

On November 9, 1918, before he claimed to have completed his well digging, defendant secured from the then city council a resolution permitting him to remove one of the two drilling machines he had been using on the Alma contract to Howell, on condition that $3,500 of his next estimate be retained "until he fulfills the provisions of his contract with the city providing for 2,000 gallons per minute." He was paid 75% of the contract price provided for on individual tests, and was also successful in securing from the city 15% more on warrants issued by the city clerk and authorized by the city authorities, as is claimed. When trouble arose over testing the wells in combination, following a change of city administration in the spring of 1919, he had received all but $4,000 of the contract price and taken his other drilling machine and equipment away with him to St. Louis, Michigan, without permission of the city.

Claiming right under the contract to retain possession of this drilling machine so taken without authority, plaintiff after proper demand brought this action of replevin to recover its possession in the circuit court of Gratiot county where trial by jury was had, resulting in a directed verdict for plaintiff with nominal damages of 6 cents, and judgment thereon.

The questions raised and argued under defendant's assignments of error involve a construction of the contract in relation to the so-called penalty provision, whether any duty devolved on defendant to make a combined test of the wells or to co-operate with plaintiff in so doing, and refusal of the court to permit defendant to show what was meant by 8 or 10-inch wells.

The city had not completed the erection and equipment of a pumping station when defendant quit on December 2, 1918. The land where the wells were drilled lies near the Pine river and is comparatively low. Early in the spring of 1919 the river rose with its spring flood until it overflowed the land where the wells were for several days. Defendant claimed that this carried silt, or mud, into the uncapped and uncared for wells, for which he was not responsible, and accounted for the failure of the wells on combined test to produce a sufficient flow to meet his guaranty on the two theories that they had been impaired by the flood and the combined test by city, in which he declined to participate, or to recognize, was not properly made.

That the spring flooding by the river impaired the efficiency of the wells is a questioned theory but, be that as it may, by a fair construction of this contract defendant had possession of the wells he drilled and was responsible for them until a combined test was made as the contract specified, or until he had given notice and made demand of the city for such test within a reasonable time, after which, if not complied with, he might treat the contract as breached. This contract, though inartistically drafted in certain particulars, is fundamentally such that neither party could absolutely default the other without notice. Its comprehensively expressed ultimate object was that defendant would drill a sufficient number of wells for

the city at a stated price, which should produce in combination a specified flow of water as shown by a combined test.    By paragraph 7 of the contract he was given possession of the tract of land where the wells were to be drilled for all purposes essential to performance on his part, with the right to put down as many wells as he wished wherever he thought best. He had the right to their possession and control until they were combined and tested, and the implied, if not expressed, right to drill more if found necessary to carry out his agreement.    Time was not made of the essence of their contract by the date for performance stated in paragraph 12, which contemplated possible delays by reason of inability to get material, or for other causes beyond their control.

Turning to the contract, we find its first four paragraphs devoted to detailing what defendant contracts to do.    In them no obligations on the part of the city, direct or inferential, are found, beyond the implied agreement to pay him the stated price for full performance of his contract.

The first paragraph distinctly obligates him to furnish adequate machinery, labor, etc., including "everything necessary in the premises," and to drill a sufficient number of wells to furnish the city with safe drinking water therefrom to the amount of 2,000 gallons per minute, and he "guarantees to produce the same" for the $40,000.    This unqualified guaranty underlies his whole contract, which makes plain that the separate flow of individual wells measured at different times to that amount is not the accepted test of the guaranty.    The second paragraph provides that the wells must all be combined, and their combined flow must reach that amount before the guaranty is fulfilled.    Unless modified by subsequent provisions, as is claimed, it is plain the duty of producing and proving that guaranteed amount of water by the

method prescribed is placed upon defendant. This he has never done or offered to do, nor requested plaintiff to do, nor offered to assist or co-operate with it in so doing.

The third and fourth paragraphs specify the size of wells, material to be used, his duty to observe State laws and city ordinances, furnish good material and workmanship and protect the city from liability for casualties.

The fifth, sixth and seventh paragraphs deal with and are primarily devoted to payments, providing times when to be made, amounts and conditions. In paragraph 5, subordinate and directed to the paramount provision as to payment, appears a qualifying, and not in all respects lucid, provision, relating to the city installing its pumping machinery, etc., which, it is contended for defendant, modifies the previous paragraphs prescribing his obligations and in effect ended his active duties when the aggregate of individual tests of wells he claimed completed, made at different times, summed up to a flow of 2,000 gallons per minute.

Defendant's estimates furnished under paragraph 5 for separate wells appear in the aggregate to have exceeded the minimum requirement by 38 gallons, and the 75% of the entire contract price it entitled him to has been paid. Paragraph 11 takes care of the situation so far as that transaction is concerned, in the event he thereafter fails to fulfill "said contract by producing the amount of water required, or otherwise."

Claiming that sufficient wells were drilled on December 2, 1918, he was then at liberty under the first provision of paragraph 6 to demonstrate in such manner and as soon as he saw fit, "to the common council and their engineer that he has produced the amount of water required under the contract and that he has paid all claims for material, labor, accidents, and dam-

ages," etc., which as it reads entitled him to 15% more, leaving but 10% of the full contract price contingent on further demonstrations under the provisions of paragraph 7; but the concluding sentence of paragraph 6 defers the time for payment of that 15% to a final test after "the city has installed its pumping machinery and the necessary suction pipes leading to the wells." This manifestly inapt and beclouding modification is based on the assumption of things to be done by the city not otherwise mentioned or provided for. Nowhere else in this contract is any mention made of the city having pumping machinery, or intimation that it is required to get and install the same in a pumping station or elsewhere. But assuming, as these parties seem to have done, that such is to be inferred from this clause and that it devolved upon the city to build a pumping house near by with pumping machinery installed in it by which the final combined test should be made, such requirement does not relieve defendant of his guaranty to produce from the combined flow of the wells he drilled the volume of water. If the concluding provision in paragraph 6 as to time of payment modified what went before and relieved him of alone preparing for and making a combined test, relegating it to a station and machinery to be built and installed by plaintiff, his duty yet remained to make the test, or at least to co-operate with plaintiff in making it, and demonstrate as required in paragraph 6, "that he has produced the amount of water required under his contract," etc., unless he had previously given notice and made demand as before stated.

As to the questioned provisions of paragraph 10 providing for penalty and forfeiture, it is not necessary in this replevin action at law involving only the right of possession to pass upon how or to what extent they may be ultimately enforced. The word "penalty"

is of such elastic meaning that it may signify more or less according to the subject-matter and connection in which it is used. No bond appears to have been required in this case as is usual in contracts with municipalities and, as a *quasi* substitute therefor, we see nothing illegal in the stipulation that possession of this machinery should remain in the city as security for faithful performance. To that extent paragraph 10 is valid and enforceable in a possessory action where nonperformance is shown.

It appears that in the spring of 1919 a city manager named Reynolds who had experience in city engineering and other duties in such service was employed by plaintiff. When he took charge, on May 13, 1919, he found on the water works property the unconnected piping of the wells sticking above the ground and a completed concrete station building, 40x60 feet, but the pumping machinery not yet installed. He proceeded to install the machinery and communicated on the subject by letter with defendant who was then at Jackson. They met at Alma in June and visited the wells together where Reynolds interrogated him about the depth, flow and number given to each well, length and size of screens and other matters preparatory to connecting them up for test and use. Defendant said he had the information at Jackson and would get it for him but failed to do so, as Reynolds claimed, only bringing him a small plat showing the place and number of each well. While there he explained something of his manner of constructing the wells, piping, casing, strainers at the bottom of a four-inch pipe, etc., and said that all the wells were cut off at uniform depth below the surface of the ground. Amongst other things, Reynolds asked him why he installed a 4-inch pipe in a 10-inch well. His explanation was apparently questioned by Reynolds. He remained about an hour and left without making any offer to

co-operate or assist in a combined test or, as Reynolds claimed, furnishing the information desired as to the wells for test purposes.

The wells were connected up by Reynolds, followed by both tentative and final tests with metered flow and the flow of all the wells by such test did not exceed 750 gallons per minute. Defendant was sent for after the first test. The mayor of Alma and Reynolds went over the situation with him, told him they wanted no trouble but did want water and asked his opinion as to how to get it. He denied any responsibility, claimed the wells were stopped by silt from the spring freshet and said the way for them to get more water was to put down more wells. On their insisting that he was yet obligated under his contract to demonstrate that he had produced the combined flow as specified, he declined in emphatic language to further advise or assist them.

Plaintiff introduced proof that it had installed adequate pumping machinery with requisite suction pipe leading to and connected with the wells and by proper methods measured their flow in one volume, which proved to be less than half the guaranteed amount. To meet this defendant introduced testimony tending to show that the wells were not properly connected with the suction pipe to correctly measure the flow and no true test was ever made, which it is urged at least raised a question of fact for the jury. If that issue had been submitted to the jury and determined in defendant's favor it would not show that the wells if properly tested in combination would meet his guaranty. When called upon to do so he refused to co-operate with the plaintiff in making the test. Had the city refused to co-operate with him or to make the connections and conduct the test as he directed it should be done, another question would be presented;

214—Mich.—9.

but he made no offer, request, or demand in that particular, so far as shown, and flatly refused to advise or participate in the prescribed method of proving whether or not he had fulfilled on his part.

The controlling question here is plaintiff's right to possession of the equipment when replevied. Upon that issue the trial court rightly found under the undisputed facts disclosed by this record that defendant had not fulfilled all the covenants of his contract, which provided that until he did such equipment should remain in the possession of said city.

The judgment will stand affirmed.

MOORE, WIEST, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.